UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| AMY MEYER,<br><br>              Plaintiff,<br><br>vs.<br><br>MARK MEYER,<br><br>              Defendant. | 4:21-CV-04076-RAL<br><br>OPINION AND ORDER DENYING<br>MOTION TO DISMISS |

Michael Meyer ("Mike") passed away on December 2, 2020, after several years of suffering from Huntington's disease. Doc. 1 at 3; Doc. 11 at 1. He was forty-five years old. Doc. 11 at 1. Mike's widow Amy Meyer ("Amy") filed a complaint against Mike's brother Mark Meyer ("Mark") on April 27, 2021, alleging one count of undue influence and one count of breach of fiduciary duties. Doc. 1 at 4–5. The complaint alleges that Mark exerted undue influence on Mike to make himself the beneficiary of Mike's $300,000 life insurance policy while Mike was suffering from Huntington's disease and Mark was acting as his attorney-in-fact. Doc. 1 at 3. Mark filed a motion to dismiss for lack of personal jurisdiction and improper venue, which this Court now denies. Doc. 6.

**I.    Facts**

Amy and Mike married in 2001 and remained married until Mike's death. Doc. 11 at 2; Doc. 12 at 1. They purchased a home in Sioux Falls, South Dakota, in 2003 and have two children together. Doc. 1 at 1–2; Doc. 11 at 2; Doc. 12 at 1. Amy and Mike resided in South Dakota for

1

most of their marriage, and Amy continues to reside in South Dakota. Doc. 11 at 2–3; Doc. 12 at 1. Mike filed federal tax returns in South Dakota, had a South Dakota driver's license, and was registered to vote in South Dakota. Doc. 12 at 3, 16–17. Mark, the Defendant, is a lifelong resident of Minnesota and currently resides in Ironton, Minnesota. Doc. 1 at 1; Doc. 7 at 1; Doc. 8 at 1.

Mike was a financial planner before his illness prevented him from working. Doc. 1 at 2; Doc. 11 at 3; Doc. 12 at 2. In 2011, before Mike was diagnosed with Huntington's disease, he purchased a $300,000 life insurance policy ("the Policy") from ING/Voya. Doc. 1 at 2; Doc. 11 at 1–2; Doc. 12 at 2. The Policy initially listed Amy as the primary beneficiary and Mike and Amy's two children as contingent beneficiaries. Doc. 11 at 2; Doc. 12 at 2.

On April 25, 2012, Mike executed a general durable power of attorney appointing Amy and Mark jointly as attorneys-in-fact for his medical care. Doc. 1 at 3; Doc. 11 at 2–3. The same day, he executed another general durable power of attorney appointing Amy and Mark jointly as attorneys-in-fact for his financial affairs. Doc. 1 at 3; Doc. 11 at 2–3; Doc. 12 at 2, 7–13.

Sometime later, but before August 2017, Mike was diagnosed with Huntington's disease— an incurable neurological disorder that causes degeneration of brain cells and impairs a person's physical and cognitive functioning. Doc. 11 at 1; Doc. 12 at 1–2. Mike became confused as his disease progressed. Doc. 11 at 3; Doc. 12 at 2. He frequently slurred his words as if he was drunk and trembled as if he had Parkinson's disease. Doc. 11 at 3; Doc. 12 at 2. He began to carry a card stating that he suffered from Huntington's disease because some people would assume that he was drunk. Doc. 11 at 3; Doc. 12 at 2. Amy cared for Mike in their home with the assistance of home health care workers. Doc. 11 at 3. Mark also called Mike at his home in South Dakota and handled Mike's business affairs during this time. Doc. 11 at 1; Doc. 12 at 4.

Mike's disease progressed to the point where Amy could no longer provide the care and supervision he needed, and Mike was transferred to an assisted living facility in Sauk Rapids, Minnesota, in August 2017. Doc. 7 at 1; Doc. 8 at 1; Doc. 12 at 2–3. Amy claims that the move was intended to be temporary. Doc. 11 at 3; Doc. 12 at 3. At the assisted living facility, Amy expected that Mike would gain weight and have more supervision, and she would have a respite from providing care. Doc. 12 at 3. Sauk Rapids is approximately 75 miles from Ironton, Minnesota, where Mark lives. Doc. 8 at 1. Amy's uncle, Kelly Brown, is also a resident of Sauk Rapids. Doc. 8 at 1. Mr. Brown visited Mike often at the assisted living facility. Doc. 8 at 1.

Sometime around the end of 2017 or the beginning of 2018, Amy received a letter at her and Mike's South Dakota address providing notice that the address on the Policy had been changed from Mike and Amy's home address to Mark's address in Minnesota. Doc. 11 at 4; Doc. 12 at 3. Amy asked Mark why the address was changed, but he would not give her a direct answer. Doc. 12 at 3. Amy stopped receiving notices related to the Policy thereafter. Doc. 12 at 3.

In February 2018, Amy alleges that Mark changed the address of Mike's AAA life insurance policy from Mike and Amy's South Dakota address to Mark's Minnesota address. Doc. 11 at 3; Doc. 12 at 3. Amy alleges that Mark also changed the South Dakota address of Mike's USAble life insurance policy to his Minnesota address sometime around or before June 2019. Doc. 11 at 4; Doc. 12 at 4. Amy received notice of these address changes. Doc. 11 at 4. Again, Mark would not give Amy a direct answer on why the addresses were changed. Doc. 11 at 4.

Amy further alleges that Mark drafted a Statement of Intentions, dated May 30, 2018, that he presented to Mike for his signature. Doc. 1 at 3; Doc. 12 at 23–26. The document stated that Mike wished for Mark to receive the Policy proceeds and the proceeds of another $50,000 insurance policy. Doc. 1 at 3; Doc. 12 at 24. Mark remained Mike's attorney-in-fact at the time,

3

Doc. 1 at 3, and Mike was suffering from physical and cognitive deterioration, lacked the ability to care for himself, and lacked the physical dexterity to type such a document. Doc. 11 at 5. The Statement of Intentions appears to have Mike's signature, and Mark was the only witness. Doc. 1 at 3. At some point, the Policy's beneficiary was changed from Amy to Mark. Doc. 7 at 1; Doc. 12 at 5.

On November 10, 2018, a little over one year after Mike had moved into the assisted living facility in Sauk Rapids, he moved to Dow Rummel Village, an assisted living facility in Sioux Falls. Doc. 8 at 1; Doc. 12 at 4. Mike did not register to vote in Minnesota, pay Minnesota taxes, or receive Minnesota public benefits while he lived in Sauk Rapids. Doc. 11 at 3. Mark visited Mike at Dow Rummel Village in Sioux Falls several times. Doc. 12 at 4. He also communicated with Amy during this time through phone calls, emails, and letters. Doc. 11 at 5; Doc. 12 at 4. Mike died a little over two years after he moved back to Sioux Falls on December 2, 2020. Doc. 1 at 3; Doc. 11 at 1; Doc. 12 at 1.

After Mike's death, Mark made a claim to receive the proceeds of the Policy and mailed Amy three letters. Doc. 1 at 3; Doc. 11 at 5; Doc. 12 at 4–5, 18, 20–22, 27–30. The first letter was dated December 14, 2020, and enclosed Mike's AAA life insurance policy. Doc. 11 at 5; Doc. 12 at 4, 18–19. The address on the AAA insurance policy was Mark's business address in Aitkin, Minnesota. Doc. 11 at 5; Doc. 12 at 4. On December 18, 2020, Mark mailed Amy two more letters that stated Mike wished for Mark to receive the proceeds of several insurance policies. Doc. 11 at 5–6; Doc. 12 at 5, 20–30. The letters also enclosed the Statement of Intentions dated May 30, 2018, and provided details on Mike's finances and assets. Doc. 11 at 5–6; Doc. 12 at 5, 20–30.

## II.      Legal Standard

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must state sufficient facts in the complaint to support a reasonable inference that [the defendant] can be subjected to jurisdiction within the state." Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1072 (8th Cir. 2004) (cleaned up and citation omitted). "The evidentiary showing required at the prima facie stage is minimal . . . ." K-V Pharm. Co. v. J. Uriach & CIA, S.A., 648 F.3d 588, 592 (8th Cir. 2011) (citation omitted). "The Plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." Dever, 380 F.3d at 1072 (cleaned up and citation omitted). A court must also "view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in its favor in deciding whether the plaintiff made the requisite showing." K-V Pharm. Co., 648 F.3d at 592.

"Personal jurisdiction in a diversity case exists only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." Id. (cleaned up and citation omitted). "South Dakota applies its long-arm statute to the fullest extent permissible under due process . . . ." Bell Paper Box, Inc. v. Trans W. Polymers, Inc., 53 F.3d 920, 921 (8th Cir. 1995) (citing Ventling v. Kraft, 161 N.W.2d 29, 34 (S.D. 1968)). Therefore, this Court must "only determine whether exercise of personal jurisdiction comports with due process." Id. (cleaned up and citation omitted). "The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts. Although a nonresident's physical presence within the territorial jurisdiction of the court is not required, the nonresident generally must have certain 'minimum contacts' such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Walden v. Fiore, 571 U.S. 277, 283 (2014) (cleaned up and citations omitted).

"[F]or a state court to exercise specific jurisdiction, the *suit* must arise out of or relate to the defendant's contacts with the *forum*. . . . [T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty., 137 S. Ct. 1773, 1780 (2017) (cleaned up and citations omitted); see also Fastpath, Inc. v. Arbela Techs. Corp., 760 F.3d 816, 821 (8th Cir. 2014) (citations omitted) ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State[,]" meaning that "the relationship must arise out of contacts that the defendant *himself* creates with the forum State."); Walden, 571 U.S. at 286 ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."). The contacts "must show that the defendant deliberately reached out beyond its home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1025 (2021) (cleaned up and citation omitted). "To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." Walden, 571 U.S. at 286 (citation omitted).

"[T]he Eighth Circuit has established five factors that must be considered in determining whether sufficient minimum contacts exist for personal jurisdiction: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." K-V Pharm. Co., 648 F.3d at 592

6

(cleaned up and citation omitted).  "[T]he first three factors are primary factors, and the remaining two are secondary factors . . . ."  Id. (citation omitted); see also Dever, 380 F.3d at 1073–74. Because the first three factors are closely related, they may be considered together.  See Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd., 89 F.3d 519, 523 (8th Cir. 1996).

### III.    Discussion

#### A. Personal Jurisdiction

Mark claims that Mike was a Minnesota resident at the time of the alleged misconduct because he would have been eligible to vote and receive public benefits in Minnesota while he lived in Sauk Rapids.  Doc. 7 at 3.  Therefore, Mark argues his contacts in South Dakota are too tenuous to satisfy the due process standard for specific jurisdiction[1] as the alleged misconduct occurred in Minnesota and was committed by a Minnesota resident against another Minnesota resident.  Doc. 7 at 1, 3.  See Walden, 571 U.S. at 277 (citing Calder v. Jones, 465 U.S. 783, 788–89 (1984)) (stating that, when considering an action involving intentional torts, the "plaintiff cannot be the only link between the defendant and the forum").

Amy responds that Mike remained a South Dakota resident while he was living in Sauk Rapid, and specific jurisdiction exists because Mark purposely directed activity toward South Dakota and South Dakota residents.  Doc. 11 at 10–11.  Relying in part on the analysis initially set

---

[1] "Specific jurisdiction is jurisdiction over causes of actions arising from or related to the defendant's actions in the forum state. . . .   General jurisdiction refers to the power of a state to adjudicate any cause of action regardless of where the cause of action arose."  Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc., 65 F.3d 1472, 1432 n.4 (8th Cir. 1995) (citation omitted). "A state may exercise general jurisdiction if a defendant has carried on in the forum state a continuous and systematic, even if limited, part of its general business; in such circumstances the alleged injury need not have any connection with the forum state."  Steinbuch v. Cutler, 518 F.3d 580, 586 (8th Cir. 2008) (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 779 (1984)). There is no general jurisdiction in South Dakota over Mark.  See Doc. 7 at 2; Doc. 11 at 6–7.

forth in <u>Calder v. Jones</u>, 465 U.S. 783 (1984), Amy argues that Mark established minimum contacts with South Dakota by communicating with Mike and her in South Dakota; visiting Mike in South Dakota; changing the South Dakota addresses of Mike's insurance policies; acting as Mike's attorney-in-fact under South Dakota law; and beginning to exert undue influence on Mike while Mike was still living in South Dakota and continuing such conduct after Mike moved to Sauk Rapids.  Doc. 11 at 10–14.

In <u>Calder</u>, a plaintiff brought a libel action in California concerning an article that was written and edited in Florida but circulated in California.  <u>Calder</u>, 465 U.S. at 784.  Defendant Calder had "reviewed and approved the initial evaluation of the subject of the article and edited it in its final form[,]" and he oversaw operation of the publication in which the article appeared.  <u>Id.</u> at 786.  Although Calder was a Florida resident and had only visited California twice, the Supreme Court held that California had jurisdiction over him "based on the 'effects' of [his] Florida conduct in California."  <u>Id.</u> at 786, 789 (citation omitted).  Although the article was written and edited in Florida, the Court reasoned that it "was drawn from California sources, and the brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California."  <u>Id.</u> at 788–89.  The defendant also knew his "intentional, and allegedly tortious, actions were expressly aimed at California" and "that the brunt of that injury would be felt" in that state.  <u>Id.</u> at 789–90.

The Supreme Court has recently affirmed <u>Calder</u>'s analysis, clarifying that <u>Calder</u> "made clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State."  <u>Walden</u>, 571 U.S. at 290.  The Supreme Court continued that a "defendant's contacts with the forum State may be intertwined

8

with his transactions or interactions with the plaintiff or other parties." Id. at 286.   However, the "proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." Id. at 290.  "[P]hysical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact" when considering whether specific jurisdiction exists. Id. at 285 (citation omitted).

The first three factors set forth by the Eighth Circuit for a specific jurisdiction analysis—"[t]he nature and quality of the contacts," "the quantity of contact" and "the relationship of the cause of action to the contacts" —support a finding that jurisdiction exists. K-V Pharm. Co., 648 F.3d at 592.  Under the facts alleged, Mark established contact with South Dakota by travelling to Sioux Falls to visit Mike; communicating with Mike and Amy regularly through phone calls, email, and mail while they resided in South Dakota; and changing the South Dakota address of the Policy and several other insurance policies.  Doc. 11 at 5, 10–11, 13–14.  These contacts—particularly communicating with Mike while he lived in Sioux Falls and changing the address of the Policy—relate to the underlying controversy: whether Mark exerted undue influence on Mike to make himself the Policy's beneficiary and in doing so also violated his fiduciary duties.  See Bristol-Myers Squibb Co., 137 S. Ct. at 1780 ("[T]here must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."); In re Est. of Duebendorfer, 721 N.W.2d 438, 446 (S.D. 2006) (Under South Dakota law, a plaintiff who raises an undue influence claim must prove the following elements: "(1) [the] decedent's susceptibility to undue influence; (2) opportunity to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and (4) a result clearly showing the effects of undue influence.").

9

The two secondary factors also support a finding that South Dakota has jurisdiction.  Mark allegedly injured a South Dakota resident by taking action to remove her as the Policy's beneficiary and violated a power of attorney agreement executed in South Dakota and governed by South Dakota law.  Therefore, South Dakota has an interest "in providing a forum for [the Plaintiff's]" claims.  K-V Pharm. Co., 648 F.3d at 592.  South Dakota also provides a convenient forum for Amy.  See id.  A South Dakota forum is less convenient for Mark.[2]  However, the distance between South Dakota and Mark's home in Minnesota is not great and has not prevented Mark from travelling to South Dakota periodically in the years leading up to this action.  Doc. 12 at 4.

In considering these factors, Amy has shown sufficient facts for a South Dakota court to exercise jurisdiction over her claims against Mark.  See Est. of Witko v. Hornell Brewing Co., 156 F. Supp. 2d 1092, 1100 (D.S.D. 2001) (applying Calder to hold that South Dakota had jurisdiction when the defendants' "use of the Crazy Horse name in the manufacture, sale, and distribution of an alcoholic beverage . . . was directed at residents of South Dakota, . . . affected [South Dakota] plaintiffs, . . . and defendants knew their actions would affect residents of South Dakota"); K-V Pharm. Co, 648 F.3d at 592 (quoting Burger King Corp., 471 U.S. at 474) (stating the exercise of jurisdiction is supported when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there").

### B.  Venue

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(3) for improper venue, a "[c]ourt must construe all facts in the light most favorable to the non-moving party, and take the facts alleged in the complaint as true."  PKG Contracting, Inc. v. Smith &

---

[2] Mark's home in Ironton, Minnesota, is approximately 291 miles from the federal courthouse in Sioux Falls.

Loveless, Inc., No. CV 19-4067, 2020 WL 906760, at *5 (D.S.D. Feb. 25, 2020).  "If a defendant

prevails on a Rule 12(b)(3) motion, the district court of a district in which is filed a case laying

venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer

such case to any district or division in which it could have been brought."  Id. (cleaned up and

citation omitted).

"[V]enue may be proper in any of a number of districts," provided that "a substantial

part of the events or omissions giving rise to the claim occurred" there.  Woodke v. Dahm, 70 F.3d

983, 985 (8th Cir. 1995) (quoting 28 U.S.C. § 1391(b)(2)).  The question is "whether the district

the plaintiff chose had a substantial connection to the claim, whether or not other forums had

greater contacts."  Setco Enterprises Corp. v. Robbins, 19 F.3d 1278, 1281 (8th Cir. 1994).  When

considering a motion to dismiss for improper venue under U.S.C. § 1391(b)(2), a court is not

limited to considering only "the defendant's allegedly wrongful activities."  Steen v. Murray, 770

F.3d 698, 703 (8th Cir. 2014).  However, "the court's *focus* must be on relevant activities of the

defendant in the forum state, not on the effect of those activities on the plaintiff in the forum state."

Id.

Mark argues that this Court is an improper venue because he resides in Minnesota and

witnesses who could testify to Mike's condition at the time of the alleged misconduct are located

in Sauk Rapids, Minnesota.  Doc. 7 at 5.  He claims it would be burdensome for him and these

witnesses to travel to South Dakota for trial.[3]  Doc. 7 at 4.  Amy counters that venue in the District

of South Dakota is proper because Mark exerted undue influence on Mike before Mike moved to

Sauk Rapids.  Doc. 11 at 13–14.  She asserts that many witnesses to Mike's health and state of

---

[3] Mark's home in Ironton, Minnesota is approximately 291 miles from Sioux Falls, but roughly
129 miles from the federal courthouse in Minneapolis.  Sauk Rapids is approximately 225 miles
from Sioux Falls and 72 miles from Minneapolis.

mind—including Mike's family, friends, and medical professionals at Dow Rummel Village—are in South Dakota. Doc. 11 at 14. If this Court were to determine that the District of South Dakota is not a proper venue, then Amy argues the remedy is not to dismiss the suit but rather to transfer it to the District of Minnesota. Doc. 11 at 14.

Amy alleged that Mark began to exert undue influence before Mike moved to Sauk Rapids in 2017. Doc. 11 at 13–14; Doc. 12 at 4. Additionally, Mark allegedly diverted mail from being delivered to Amy's home in South Dakota, which may have helped Mark exert undue influence on Mike by hiding his alleged misconduct from Amy. Doc. 11 at 4; Doc. 12 at 3. The power of attorney agreement at issue in this case was also executed in South Dakota and is governed by South Dakota law. Doc. 1 at 3; Doc. 11 at 2–3. Finally, Mark's alleged misconduct targeted and injured a South Dakota plaintiff. Doc. 1 at 2–3. See Steen, 770 F.3d at 703 (Although "the court's *focus* must be on relevant activities of the defendant in the forum state" in reviewing a motion to dismiss for improper venue, a court is not limited to "*only* consider[ing] the defendant's allegedly wrongful activities."). On this record, Amy has alleged sufficient facts to show that South Dakota has "a substantial connection to the claim." Setco Enterprises Corp., 19 F.3d at 1281.

## IV.   Conclusion and Order

The Plaintiff has alleged sufficient facts to show that jurisdiction in South Dakota exists and venue is proper. Therefore, it is

ORDERED that the Defendant's Motion to Dismiss, Doc. 6, is denied.

DATED this 16th day of November, 2021.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE